Rel: December 22, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

————————————————

### SC-2023-0289

————————————————

**Ex parte McKesson Corporation et al.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Fort Payne Hospital Corporation et al.**

**v.**

**McKesson Corporation et al.)**

**(Conecuh Circuit Court: CV-21-900016)**

PER CURIAM.

The petitioners -- McKesson Corporation, AmerisourceBergen Drug Corporation, Cardinal Health, Inc., H.D. Smith, LLC, and Henry Schein, Inc. -- petition this Court for a writ of mandamus directing the Conecuh

Circuit Court to vacate its March 20, 2023, order denying their motion to dismiss the claims asserted against them by the plaintiffs -- Fort Payne Hospital Corporation, the Bibb County Healthcare Authority, the Dale County Health Care Authority, Greene County Hospital Board, Jackson Hospital & Clinic, Inc., Escambia County Alabama Community Hospitals, Inc., Mizell Memorial Hospital, Inc., the Tombigbee Health Care Authority, Geneva County Health Care Authority, Community Hospital, Inc., the Sylacauga Health Care Authority, Russellville Hospital, Inc., Lakeland Community Hospital, Inc., Monroe County Healthcare Authority, Infirmary Health Hospitals, Inc., Gulf Health Hospitals, Inc., Mobile Infirmary Association, the DCH Health Care Authority, the Healthcare Authority for Baptist Health, Medical West Hospital Authority, Evergreen Medical Center, LLC, Gilliard Health Services, Inc., Crestwood Healthcare, L.P., Triad of Alabama, LLC, QHG of Enterprise, Inc., Affinity Hospital, LLC, Gadsden Regional Medical Center, LLC, Foley Hospital Corporation, the Health Care Authority of Clarke County, BBH PBMC, LLC, BBH WBMC, LLC, BBH SBMC, LLC, BBH CBMC, LLC, and BBH BMC, LLC -- and to enter an order

2

dismissing the plaintiffs' claims with prejudice on the ground that those claims are barred by the applicable statutes of limitations.

Facts and Procedural History

"Because this petition concerns a motion to dismiss under Rule 12(b)(6), Ala. R. Civ. P., the facts in the complaint constitute the only operative facts for our review of the petition. See, e.g., Ex parte Alabama Dep't of Youth Servs., 880 So. 2d 393, 397 (Ala. 2003) ('Inasmuch as the issue before us is whether the trial court correctly denied a Rule 12(b)(6), Ala. R. Civ. P., motion to dismiss, "[t]his Court must accept the allegations of the complaint as true."' (quoting Creola Land Dev., Inc. v. Bentbrooke Hous., L.L.C., 828 So. 2d 285, 288 (Ala. 2002)))."

Ex parte Abbott Lab'ys, 342 So. 3d 186, 188 (Ala. 2021) (footnote omitted).

The plaintiffs are 34 entities that own or operate hospitals in Alabama. On March 26, 2021, the plaintiffs commenced this action in the Conecuh Circuit Court against various manufacturers of prescription opioids ("the manufacturing defendants"), various distributors of prescription opioids ("the distributor defendants"), and various retail pharmacies ("the pharmacy defendants") (collectively referred to as "the defendants"). The distributor defendants included AmerisourceBergen Drug Corporation, Anda, Inc., Cardinal Health, Inc., H.D. Smith, LLC,

Henry Schein, Inc., and McKesson Corporation.[1] In their initial complaint, the plaintiffs alleged, in pertinent part:

> "1. Plaintiffs operate hospitals that provide acute care throughout Alabama including treatment for opioid-dependent patients suffering from opioid-related conditions. These patients routinely seek services at Plaintiffs' emergency rooms and occupy beds in the Plaintiffs' Hospitals. Hospitals are legally and morally compelled to act and treat all of these patients, regardless of the price.
>
> "2. Defendants are the manufacturers, distributors, and dispensers of prescription opioids. By flooding Plaintiffs' communities with opioids, by pushing false narratives surrounding the safety of opioids, and by failing to take steps to prevent diversion of opioids, they have created an epidemic of misuse, abuse, addiction, and death."

(Footnote omitted.) The plaintiffs also alleged that "[t]he average cost of providing care for patients diagnosed with opioid use disorder is eight times higher than for those without opioid use disorder"; that those patients must still be provided with complete care; and that "private and government insurance does not cover these increased costs." (Footnote omitted.) In their initial complaint, the plaintiffs further alleged that the opioid pandemic constituted a continuous and abatable public nuisance.

---

[1]Although Anda was initially a party to this mandamus petition, it filed a motion to withdraw as a petitioner on July 11, 2023. On July 19, 2023, this Court granted Anda's motion. Therefore, we have omitted any specific allegations relating to Anda.

The plaintiffs stated claims of negligence, wantonness, public nuisance, unjust enrichment, fraud and deceit, and civil conspiracy.

On September 8, 2022, the pharmacy defendants filed a motion to dismiss the plaintiffs' claims against them pursuant to Rule 12(b)(6), Ala. R. Civ. P., which the trial court denied. The pharmacy defendants subsequently filed a petition for a writ of mandamus in this Court, which was docketed as case number 1210329. This Court ordered answers and briefs. However, the plaintiffs subsequently filed a motion to dismiss the pharmacy defendants' petition as moot. In their motion to dismiss, they asserted that they had filed a motion to dismiss their claims against the pharmacy defendants and that the trial court had granted that motion. On April 26, 2022, this Court granted the plaintiffs' motion and dismissed the petition in case number 1210329.

On September 27, 2022, the plaintiffs filed their amended complaint against the manufacturing defendants and the distributor defendants (collectively referred to as "the remaining defendants"). In their amended petition, the plaintiffs restated the allegations quoted above from the initial complaint and alleged that the actions of the remaining defendants had created an opioid epidemic and that, "[in]

5

addition to the cost of the opioid drugs themselves, the opioid epidemic has caused hospitals to incur and continue to suffer an extensive operational impact on their ability to do their jobs -- rendering care to all members of the communities they serve." In their amended complaint, they stated claims of negligence, wantonness, public nuisance, unjust enrichment, fraud and deceit, and civil conspiracy against the remaining defendants. In the section of the amended complaint setting forth the parties, the plaintiffs included the following factual allegations regarding the distributor defendants:

### "2. Distributor Defendants

"107. The Distributor Defendants are described below. At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and prevent diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with Alabama law, under which they are 'wholesaler distributors.' Plaintiffs allege that the Distributor Defendants' unlawful conduct is a substantial cause of the volume of prescription opioids plaguing Plaintiffs' communities.

### "a. AmerisourceBergen

"108. Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

"109. AmerisourceBergen is a wholesaler of pharmaceutical drugs and distributes opioids throughout the country, including in Alabama. AmerisourceBergen is the eleventh largest company by revenue in the United States, with annual revenue of $147 billion in 2016.

"110. According to its 2016 annual report, AmerisourceBergen is 'one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care.'

"111. Between 2006 and 2014, AmerisourceBergen distributed the second highest number of hydrocodone and oxycodone pills into Alabama and into Conecuh County. It distributed 282,139,350 pills into the state, 2,982,040 of which went to Conecuh County. Although the ARCOS [Automated Reports and Consolidated Ordering System] data from which this information is drawn has only been made publicly available through 2014, AmerisourceBergen continues to distribute prescription opioids into Alabama to the present day.

"112. AmerisourceBergen currently holds a Wholesale Distributor license from the Alabama Board of Pharmacy as well as a license to distribute controlled substances in Alabama. It continues to use this license to distribute pharmaceuticals, including controlled substances, into Alabama.

"113. As described in this complaint, AmerisourceBergen has had multiple instances in which it has inappropriately distributed controlled substances. From this pattern of instances, it can be inferred that AmerisourceBergen's policies and procedures have failed to adapt and change in order to prevent the future diversion of

7

prescription opioids. On that basis, Plaintiffs allege on information and belief that AmerisourceBergen continues to operate in ways that enable the diversion of prescription opioids.

"114. On July 26, 2021, [AmerisourceBergen] paid a $5,000 fine to the Alabama Board of Pharmacy for violations arising out of its 2019 conduct in Florida of distributing prescription drugs, including controlled substances, without a proper license to do so.

"115. [AmerisourceBergen] continues to make false or misleading statements about its involvement in the promotion of prescription opioids and its contribution to the ongoing opioid epidemic. [AmerisourceBergen] falsely claims on its website that it 'take[s] no action whatsoever to promote prescribing or otherwise increase demand for opioids.'

"....

"**c. Cardinal**

"121. Defendant Cardinal Health, Inc. ('Cardinal') is an Ohio corporation with its principal place of business in Dublin, Ohio. In 2016, Cardinal generated revenues of $121.5 billion.

"122. Cardinal is a global distributor of pharmaceutical drugs and medical products. It is one of the largest distributors of opioids in the United States. From 2006 to 2014, Cardinal was the third largest distributor of opioids in Alabama.

"123. In December 2013, Cardinal formed a ten-year agreement with CVS Caremark to form the largest generic drug sourcing operation in the United States.

"124. Cardinal currently holds a Wholesale Distributor license from the Alabama Board of Pharmacy as well as a license to distribute controlled substances in Alabama. It continues to use this license to distribute pharmaceuticals, including controlled substances, into Alabama.

"125. As described in this complaint, Cardinal has had multiple instances in which it has inappropriately distributed controlled substances. From this pattern of instances, it can be inferred that Cardinal's policies and procedures have failed to adapt and change in order to prevent the future diversion of prescriptive opioids. On that basis, Plaintiffs allege on information and belief that Cardinal continues to operate in ways that enable the diversion of prescription opioids.

"**d. H.D. Smith**

"126. Defendant H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Co. ('H.D. Smith') through its various DEA [Drug Enforcement Administration]-registered subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes opioids throughout the United States, including in Alabama and the communities served by Plaintiffs. H.D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals and is a Delaware corporation with its principal place of business in Illinois. H.D. Smith Wholesale Drug Co. has been restructured and is currently doing business as H.D. Smith, LLC. H.D. Smith, LLC's sole member is H.D. Smith Holdings, LLC, and its sole member is H.D. Smith Holding Company, a Delaware corporation with its principal place of business in Illinois. H.D. Smith is the largest independent wholesaler in the United States. In January 2018, Defendant AmerisourceBergen acquired H.D. Smith.

"127. Prior to its acquisition by AmerisourceBergen and at least through March 29, 2019, H.D. Smith held a Wholesale

<u>Distributor license from the Alabama Board of Pharmacy as well as a license to distribute controlled substances in Alabama. It used this license to distribute pharmaceuticals, including controlled substances, into Alabama</u>.

"128. In 2016, H.D. Smith entered into a settlement with West Virginia, agreeing to pay $3.5 million to resolve an action alleging that the company contributed to the state's opioid addiction epidemic by negligently distributing opioids.

"129. H.D. Smith's shipments to West Virginia were so extensive that the [United States] House [of Representatives'] Energy and Commerce Committee wrote to H.D. Smith in 2018, citing DEA data showing 2008 sales of 1.1 million hydrocodone doses to Family Discount Pharmacy in Mount Gay-Shamrock, a West Virginia town home to only 1,800 people. That same year, H.D. Smith sold more than 1.3 million hydrocodone and oxycodone to a Sav-Rite Pharmacy in Kermit, West Virginia, a town with a population of 406. Between 2007 and 2008, H.D. Smith also sold 5 million hydrocodone pills to pharmacies in Williamson, West Virginia, where approximately 3,000 people lived. Representatives from both parties were concerned about the volume of opioids H.D. Smith was distributing to West Virginia: 'Data provided to the committee by the Drug Enforcement Administration raises ... questions regarding H.D. Smith's efforts to monitor for, and mitigate, controlled substance diversion in West Virginia.'

"130. In 2019, in the MDL [multidistrict-litigation] proceeding styled <u>In re: National Prescription Opiate Litigation</u>, H.D. Smith and certain other smaller distributors filed a motion for summary judgment styled 'Non-RICO Small Distributors' Motion for Summary Judgment Based on their De Minimis Status (DKT # 1879).' In opposing the motion, the factual record presented by the plaintiffs (two Ohio municipalities) relating to H.D. Smith consisted of a subset of the information enumerated in this Complaint. The MDL

court denied the motion for summary judgment as to all of the moving defendants, including H.D. Smith.

"131. H.D. Smith executives were active in industry groups such as HDA [the Healthcare Distribution Alliance], HDMA [the Healthcare Distribution Management Association], and PCF [the Pain Care Forum] (via HDA's membership).

"132. J. Christopher Smith, while President and COO, was an active member of HDMA, serving as Co-Chair of its Industry Relations Counsel. Ron Lanton, Government Affairs Counsel, was a member of HDMA's Government and Public Policy Counsel. Thomas Doyle, Executive Vice President, Commercial Solutions, was part of HDMA's Specialty & Biotech Distributors Council. Dale Smith, President of H.D. Smith, appears to be an active member of HDA. On HDA's website, he is identified as HDA Vice Chairman and was Chairman and CEO of HAD's Board of Directors and Executive Committee (as of Nov. 2015), having also served on HDA's Government and Public Policy Council and Industry Relations Council. Dale Smith, President of H.D. Smith, was Vice Chairman, Chairman, and CEO of HDA's Board of Directors and Executive Committee, and also served on HDA's Government and Public Policy Council and Industry Relations Council.

"133. When distributing prescription opioids, H.D. Smith had a duty to prevent diversion by implementing an effective system to detect and halt suspicious orders and by conducting regular investigations of current and prospective customers. But H.D. Smith's policies and procedures for monitoring pharmaceutical orders have long been insufficient, which has allowed opioid diversion in Maine for an extensive period of time.

"134. From 2006 to 2008, H.D. Smith's SOM [suspicious-order-monitoring] program was manual, rather than

automated. H.D. Smith had two undated and little-used written policies covering suspicious order monitoring. Few employees of H.D. Smith knew these policies existed.

"135. Starting in 2006, H.D. Smith began working on an automated compliance system, but this 'system' was never really a viable automated system, just iterations and attempts.

"136. In or around 2008, H.D. Smith began developing a computer-based suspicious-order-monitoring program, which H.D. Smith called 'CSOMP.' CSOMP had multiple flaws that undermined its purpose of detecting and reporting suspicious orders.

"137. First, H.D. Smith's suspicious-order-monitoring reports, which might have identified suspicious orders, were not reviewed until after the flagged orders had been shipped.

"138. Second, CSOMP did not consider opioid order pattern or frequency. H.D. Smith's SOM program permitted automated release of any and all orders by new pharmacies during a 90- to 120-day period, allowing them to 'ramp up,' even when they exceeded order volume limits.

"For instance, in a May 21, 2008 internal email, George Euson ('Euson'), Director of Corporate Security, wrote to H.D. Smith employees regarding CSOMP enhancements: 'You are allowed to release all orders that show up in the system for new accounts for up to 120 days after the start date listed. This will allow ramp up of new accounts.' When opioid orders neared threshold limits, the orders were still released without further investigation or reporting, allowing the customer to build a high-volume-sales 'history.' In fact, in order to avoid reporting a suspicious order to the DEA, H.D. Smith would notify customers when they approached their threshold limits, allowing customers to request threshold increases and avoid triggering thresholds. Additionally, those thresholds

for reporting were based on the client's prior sales. So, if a client spent more, their limit could be reset to that higher point.

"139. Issues with CSOMP requiring modifications and fixes to address broken functionality continued until at least February 2015. These issues included stopping only one large controlled drug order at a time for review, while allowing a smaller order for the same customer to be filled while larger order was being reviewed; allowing 448 people within H.D. Smith to release holds in CSOMP; having a lack of tools to detect orders of unusual frequency or pattern; and having multiple accounts assigned to one customer or DEA number, each of which was assigned thresholds (i.e., 3 accounts; 3x the threshold limit for that customer).

"140. H.D. Smith was aware of deficiencies with its SOM, and management deliberately tried to hide this knowledge.

"141. An H.D. Smith employee with responsibilities for CSOMP monitoring who resigned in February 2015 explained her concerns with H.D. Smith's SOM system in her exit interview. At the time of the interview, Lori Kirbach stated as a main reason for leaving, 'the company is and has been breaking the law for some time.' She did not understand why this was being tolerated. Specifically, Ms. Kirbach stated that 'CSOMP has not been working correctly since OPUS Go Live and that no one will listen to them when they bring it up. Compliance is releasing orders that they should not be releasing.' She added that the 'DEA is about two years behind in looking at CSOMP data and it[']s only a matter of time before they catch up to us and questions are asked.' Ms. Kirbach also added that her manager 'often said not to put certain issues (such as the CSOMP issue) in email so in the event the company is ever sued and the email is produced' other employees could 'deny any knowledge.' She recalled

getting her 'ass chewed' by her manager, Tom, for putting something in an email that he thought she shouldn't have.

"142. Other H.D. Smith employees have also admitted its SOM program was insufficient. For example, Euson wrote an email on September 28, 2007 regarding a list of suspicious pharmacies he had circulated internally in February 2006 and an updated list of suspicious pharmacies in May 2007. The listed pharmacies had been identified as suspicious by other wholesalers and the DEA due to 'excess purchases of controlled substances.' Two of the DEA's suspicious pharmacies had also been identified by H.D. Smith as one of nine pharmacy customers comprising 80% of H.D. Smith's Florida distribution of oxycodone. One, Pharmcore, was a customer at the time of the February 2006 email. The other, Pharmacy Express, was set up as a customer in December 2006. According to Euson: 'Both have huge and excessive amounts of controlled substance purchases.' He continued, 'We will have a hard time explaining to DEA why after we were warned nearly 1 1/2 years ago, we continued to sell excessive quantities of CS [controlled substances] to these businesses.'

"143. Another H.D. Smith employee, P.J. VanderMeersch, Compliance Specialist, wrote in September 2013 about her serious concerns with H.D. Smith's CSOMP: 'we are absolutely not compliant with Federal Regulations and we know we aren't.'

"144. As recently as 2014, in a PowerPoint presentation regarding Compliance and Security, the Compliance Department noted the need to develop CSOMP enhancements to meet DEA standards.

"145. An H.D. Smith employee wrote an email in July 2014 noting that CSOMP program issues had 'resulted in customers receiving products which they were not supposed to.' As a result of these shortfalls, H.D. Smith shipped 17

14

bottles of oxycodone to one customer who was not supposed to be able to order any.

"146. In or around 2014, H.D. Smith hired a new compliance officer and began to create an improved CSOMP program that would comply with applicable laws. However, before any enhancements went into effect, that new compliance officer was terminated in 2016.

"147. On May 31, 2016, H.D. Smith rehired their former Vice President of Compliance.

"148. At a May 8, 2018 hearing before the House Energy and Commerce subcommittee, H.D. Smith refused to take any responsibility for the massive amounts of opioids it shipped to West Virginia, the state which at the time had the highest overdose rate in the United States. At this time, J. Christopher Smith, former President and CEO, stated, 'H.D. Smith conducted itself responsibly and discharged its obligations.'

"149. The implication that H.D. Smith has effectively addressed diversion is false, as H.D. Smith's repeated payments to settle diversion-related violations indicate.

"150. H.D. Smith's public statements misled the public, including Plaintiffs, into believing that H.D. Smith was taking effective steps to fight the opioid epidemic.

"151. Although Plaintiffs allege the dates of particular enforcement actions and other admissions or evidence of failures to prevent diversion, Plaintiffs do not allege that H.D. Smith ceased conduct that contributed to the opioid epidemic upon the last date of such an action, admission, or evidence.

"152. The fact that H.D. Smith had a pattern of violations resulting in a series of enforcement actions and a pattern of conduct evincing a failure to devise effective

procedures according with its role as a distributor of controlled substances provides grounds to infer that despite its promises to improve its policies and procedures so as to prevent the diversion of prescriptions opioids (and so contributing to the opioid epidemic in Alabama), H.D. Smith failed to do so and, in fact, on information and belief, continues to operate in ways that enable the diversion of prescription opioids.

"**e. Henry Schein**

"153. Defendant Henry Schein, Inc. ('Henry Schein') is incorporated in Delaware with its principal place of business located in Melville, New York.

"154. Henry Schein describes its business as providing products and services to integrated health systems in the non-acute care space and distributes, among other things, branded and generic pharmaceuticals to customers that include dental practitioners, dental laboratories, animal health practices and clinics, office-based medical practitioners, and ambulatory surgery centers. Overall, it is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners.

"155. Henry Schein currently holds a Wholesale Distributor license from the Alabama Board of Pharmacy as well as a license to distribute controlled substances in Alabama. It continues to use this license to distribute pharmaceuticals, including controlled substances, into Alabama.

"156. As described in this complaint, Henry Schein has had multiple instances in which it has inappropriately distributed controlled substances. From this pattern of instances, it can be inferred that Henry Schein's policies and procedures have failed to adapt and change in order to prevent the future diversion of prescription opioids. On that

16

basis, Plaintiffs allege on information and belief that Henry Schein continues to operate in ways that enable the diversion of prescription opioids.

**"f. McKesson**

"157. Defendant McKesson Corporation ('McKesson') is a Delaware corporation with its principal place of business in Irving, Texas.

"158. McKesson is the largest pharmaceutical distributor in North America. McKesson distributes approximately one-third of all pharmaceuticals used in North America. At all times relevant to this Complaint, McKesson distributed prescription opioids throughout the United States, including in Alabama.

"159. From 2006 to 2014, McKesson was the largest distributor of oxycodone and hydrocodone in Alabama. McKesson continues to distribute products, including controlled substances, to customers within the State of Alabama. McKesson currently holds an active license from the Alabama Board of Pharmacy to distribute controlled substances in Alabama.

"160. In its 2018 annual report, McKesson stated that it 'partner[s] with [pharmaceutical] manufacturers, providers, pharmacies, governments and other organizations in healthcare to help provide the right medicines, medical products and healthcare services to the right patients at the right time, safely and cost-effectively.'

"161. As described in this complaint, McKesson has had multiple instances in which it has inappropriately distributed controlled substances. From this pattern of instances, it can be inferred that McKesson's policies and procedures have failed to adapt and change in order to prevent the future diversion of prescription opioids. On that basis, Plaintiffs

17

allege on information and belief that McKesson continues to operate in ways that enable the diversion of prescription opioids.

"162. Collectively, McKesson, AmerisourceBergen, and Cardinal account for 85% of drug shipments in the United States and take in about $400 billion in annual revenue.

"163. Cardinal, Anda, H.D. Smith, Henry Schein, AmerisourceBergen, and McKesson are collectively referred to as the 'Distributor Defendants' or the 'Supply Chain Defendants.'"

(Emphasis added; footnotes omitted.)

Additionally, in their factual allegations, the plaintiffs asserted that the distributor defendants "have and have breached duties to guard against, prevent, and report suspicious orders and unlawful diversion" of opioids. They also asserted that the distributor defendants have "worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum and the Healthcare Distribution Alliance." They further asserted that the distributor defendants "were aware of and have acknowledged their obligations to prevent diversion and report and take steps to halt suspicious orders"; that the distributor defendants "kept careful track of prescribing data and knew about suspicious orders and prescribers"; and that the distributor defendants "failed to report suspicious orders or otherwise act

to prevent diversion." After discussing conduct that goes back many years, the plaintiffs stated:

"876. Defendants have admitted to disregarding their duties. They have admitted that they pumped massive quantities of opioids into communities around the country despite their obligations to control supply, prevent diversion, and report and take steps to halt suspicious orders.

"877. On the basis of this pattern of misconduct, Plaintiffs allege that, despite these enforcement activities and despite their promises to improve their policies and procedures so as to prevent the diversion of prescription opioids (and so contributing to the opioid epidemic in Alabama), Defendants have failed to do so and, in fact, on information and belief, continue to operate in ways that enable the diversion of prescription opioids."

The plaintiffs further asserted that the distributor defendants "delayed a response to the opioid crisis by pretending to cooperate with law enforcement"; that the distributor defendants unlawfully distributed opioids; that the distributor defendants breached their duties; and that each of the distributor defendants have engaged in wrongful conduct.

With regard to Cardinal, the plaintiffs alleged that "Cardinal's flawed written policies enabled opioid diversion"; that Cardinal failed to effectively prevent diversion in practice; and that Cardinal had been put on notice of its wrongful conduct. They further alleged:

19

"976. From this pattern of misconduct and Cardinal's evident refusal to adopt policies and procedures that would effectively prevent diversion -- despite promising to do so, Plaintiffs allege that Cardinal has continued to engage in conduct contributing to the opioid epidemic in Alabama by distributing opioids under circumstances suggestive of potential diversion."

With regard to AmerisourceBergen, the plaintiffs alleged that "AmerisourceBergen's flawed written policies enabled opioid diversion"; that AmerisourceBergen failed to effectively prevent diversion in practice; and that AmerisourceBergen had been put on notice of its wrongful conduct. They further alleged:

"990. AmerisourceBergen continues to distribute opioids into Alabama and, on information and belief, continues to distribute them under circumstances suggestive of potential diversion."

With regard to H.D. Smith, the plaintiffs alleged:

"1000. H.D. Smith was the seventh largest distributor of opioids in Alabama during this time period. H.D. Smith's excessive distribution was made possible by, and is evidence of, H.D. Smith's failure to comply with its duties under state and federal law.

"1001. As described elsewhere in this Complaint, Plaintiffs allege based on H.D. Smith's pattern of misconduct that it engaged in activities contributing to the opioid epidemic within the relevant limitations period."

With regard to Henry Schein, the plaintiffs alleged that "Henry Schein continues to distribute controlled substances into Alabama." They further included allegations regarding "Henry Schein's inadequate SOM program."

With regard to McKesson, the plaintiffs alleged:

"1011. In May 2008, McKesson entered into a settlement agreement with the DEA to settle claims that McKesson had failed to maintain effective controls against diversion of controlled substances in Florida, Maryland, Colorado, Texas, Utah, and California (the '2008 McKesson Settlement Agreement').

"1012. In the 2008 McKesson Settlement Agreement, McKesson 'recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA.' McKesson agreed to 'maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders ... and follow the procedures established by its Controlled Substance Monitoring Program.' But McKesson failed to do so. It was later revealed that McKesson's system for detecting 'suspicious orders' from pharmacies was so ineffective and dysfunctional that, in a five-year period, it filled more than 1.6 million orders, but reported just 16 orders as suspicious -- all from a single consumer.

"1013. In January 2017, McKesson admitted to its ongoing breach of its duties to monitor, report, and prevent suspicious orders of oxycodone and hydrocodone by entering into a Settlement Agreement and Release with the DEA and the DOJ [Department of Justice] (the 'the 2017 McKesson Settlement Agreement').

21

"1014. In the 2017 McKesson Settlement Agreement, McKesson admitted that, between January 1, 2009 and January 17, 2017, it 'did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters.' Despite its obligations under the 2008 Settlement Agreement, McKesson still 'failed to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA [Controlled Substances Act], and 21 C.F.R. § 1301.74(b).'

"1015. In the 2017 McKesson Settlement Agreement, McKesson further admitted that it had 'distributed controlled substances to pharmacies even though those [McKesson] Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a).' McKesson admitted that it had 'failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations.'

"1016. As part of the 2017 McKesson Settlement Agreement, McKesson agreed that its authority to distribute controlled substances from 12 distribution centers would be partially suspended for several years. The overall sanctions included in the 2017 Settlement Agreement were the most severe ever imposed on a DEA-registered distributor.

"1017. According to the Washington Post and 60 Minutes, DEA staff recommended a much larger penalty than the $150 million ultimately agreed to -- as much as a billion

22

dollars -- and delicensing of certain facilities. A DEA memo outlining the investigative findings in connection with the administrative case against 12 McKesson distribution centers included in the 2017 Settlement stated that McKesson '[s]upplied controlled substances in support of criminal diversion activities'; '[i]gnored blatant diversion'; had a '[p]attern of raising thresholds arbitrarily'; '[f]ailed to review orders or suspicious activity'; and '[i]gnored [the company's] own procedures designed to prevent diversion.'"

(Footnotes omitted.) The amended complaint also alleged that the distributor defendants "have sought to and have misrepresented their compliance with their legal duties" and that "repeated admonishments and fines did not stop the distributor defendants from ignoring their obligations to control the supply chain and prevent diversion."

In their "additional allegations pertaining to punitive damages," the plaintiffs asserted:

"1033. Each Defendant knew that large and suspicious quantities of opioids were being poured into communities throughout the United States. Despite this knowledge, Defendants took either no steps or utterly inadequate steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion. Indeed, as described above, Defendants acted in concert to maintain high quotas for their products and to ensure that suspicious orders would not be reported to regulators.

"1034. Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from federal and state governments and regulatory agencies. Defendants paid their fines, made

23

promises to do better, and continued on with their marketing and supply schemes. <u>This ongoing course of conduct knowingly, deliberately, and repeatedly threatened and accomplished harm to public health and safety and large-scale economic loss to hospitals, families, communities, and governments across the state</u>.

"1035. As all of the governmental actions against Defendants show, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and profits."

(Emphasis added.)

On September 8, 2022, the distributor defendants filed a motion to dismiss the plaintiffs' claims against them pursuant to Rule 12(b)(6), Ala. R. Civ. P. In their motion, the distributor defendants alleged, among other things, that the plaintiffs' claims against them were barred by the applicable statutes of limitations. On March 20, 2023, the trial court entered an order denying the motion to dismiss. The petitioners subsequently filed their petition for a writ of mandamus directing the trial court to vacate its March 20, 2023, order denying their motion to dismiss and to enter an order dismissing the plaintiffs' claims against them with prejudice.

<u>Standard of Review</u>

24

"'A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: "'(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" Ex parte Nall, 879 So. 2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Grp., Inc., 823 So. 2d 1270, 1272 (Ala. 2001)).'

"Ex parte Watters, 212 So. 3d 174, 180 (Ala. 2016).

"'The general rule is that, subject to certain narrow exceptions, the denial of a motion to dismiss is not reviewable by petition for a writ of mandamus.' Ex parte Brown, 331 So. 3d 79, 81 (Ala. 2021). However,

"'[t]his Court has recognized that an appeal is an inadequate remedy in cases where it has determined that a defendant should not have been subjected to the inconvenience of litigation because it was clear from the face of the complaint that the defendant was entitled to a dismissal or to a judgment in its favor.'

"Ex parte Sanderson, 263 So. 3d 681, 687-88 (Ala. 2018) (citing Ex parte Hodge, 153 So. 3d 734 (Ala. 2014), and Ex parte U.S. Bank Nat'l Ass'n, 148 So. 3d 1060 (Ala. 2014)). In particular, in Ex parte Hodge, this Court permitted mandamus review of a trial court's denial of a motion to dismiss contending that the plaintiff's malpractice claim was barred by the four-year statute of repose contained in § 6-5-482(a), Ala. Code 1975, when the applicability of that statute was clear from the face of the complaint. Cf. Ex parte Watters, 212 So. 3d at 182 (denying a mandamus petition because 'it [was] not abundantly clear from the face of [the plaintiff's] complaint whether the survival statute dictate[d]

25

dismissal of the legal-malpractice claim because the issue whether the claim sound[ed] in tort, in contract, or in both for that matter, [was] sharply disputed by the parties'). Thus, if it is clear from the face of [the plaintiff's] complaint that the claims against [the defendant] are barred by the rule of repose or the applicable statute of limitations, then [the defendant] is entitled to mandamus relief.

"With respect to evaluating a trial court's denial of a Rule 12(b)(6) motion to dismiss,

"'[t]he appropriate standard of review ... is whether "when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [the pleader] to relief." Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993); Raley v. Citibanc of Alabama/Andalusia, 474 So. 2d 640, 641 (Ala. 1985). This Court does not consider whether the plaintiff will ultimately prevail, but only whether the plaintiff may possibly prevail. Nance, 622 So. 2d at 299. A "dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." Nance, 622 So. 2d at 299; Garrett v. Hadden, 495 So. 2d 616, 617 (Ala. 1986); Hill v. Kraft, Inc., 496 So. 2d 768, 769 (Ala. 1986).'

"Lyons v. River Rd. Constr., Inc., 858 So. 2d 257, 260 (Ala. 2003)."

Abbott, 342 So. 3d at 193-94.

"'"[A] Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim

26

that would entitle the plaintiff to relief." Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993) (citations omitted). "Next, the standard for granting a motion to dismiss based upon the expiration of the statute of limitations is whether the existence of the affirmative defense appears clearly on the face of the pleading." Braggs v. Jim Skinner Ford, Inc., 396 So. 2d 1055, 1058 (Ala.1981) (citations omitted).'

"Jones v. Alfa Mut. Ins. Co., 875 So. 2d 1189, 1193 (Ala. 2003)."

Limon v. Sandlin, 200 So. 3d 21, 23-24 (Ala. 2015).

## Discussion

The petitioners argue that the trial court erroneously denied their motion to dismiss based upon statute-of-limitations grounds. They contend that

"Plaintiffs' claims against Distributors are barred by the applicable two-year statute of limitations. See Abbott, 342 So. 3d at 194 & n.7; Ex parte Brian Nelson Excavating, LLC, 25 So. 3d 1143, 1154 (Ala. 2009) (discussing 'the two-year statute of limitations in § 6-2-38, Ala. Code 1975, for nuisance claims')."

Petition at 6. In Abbott, this Court stated:

"The statute of limitations for a nuisance claim is two years.[7] See, e.g., Ex parte Brian Nelson Excavating, LLC, 25 So. 3d 1143, 1145 (Ala. 2009) (discussing 'the two-year statute of limitations in § 6-2-38, Ala. Code 1975, for nuisance claims').

"_____

27

"⁷The applicable statute of limitations for most of Mobile Health's other claims against Abbott -- negligence, wantonness, and fraud and deceit -- is also two years. See, e.g., Ex parte Capstone Bldg. Corp., 96 So. 3d 77, 88 (Ala. 2012) ('We once again reaffirm the proposition that wantonness claims are governed by the two-year statute of limitations now embodied in § 6-2-38(l)[, Ala. Code 1975].'); Bush v. Ford Life Ins. Co., 682 So. 2d 46, 47 (Ala. 1996) ('The statute of limitations applicable to a negligence claim is two years.'); Liberty Nat'l Life Ins. Co. v. McAllister, 675 So. 2d 1292, 1297 (Ala. 1995) ('A fraud action is subject to a two-year statute of limitations.'). The same limitations period applies to the civil-conspiracy claims. See, e.g., Freeman v. Holyfield, 179 So. 3d 101, 105 (Ala. 2015). This Court has not decided whether the applicable limitations period for an unjust-enrichment claim is two years or six years. See Snider v. Morgan, 113 So. 3d 643, 655 (Ala. 2012) ('Our research similarly confirms that there is a distinct absence of authority definitively stating the statute of limitations applicable to an unjust-enrichment claim. We need not, however, decide that issue here.'). However, Mobile Health did not argue before the circuit court or in this Court that its unjust-enrichment claim against Abbott is within the statute of limitations absent tolling through fraud, an argument we address later in this opinion."

342 So. 3d at 194-95.² The petitioners assert that "[t]his Court should grant mandamus review and confirm that Abbott compels dismissal because Plaintiffs' own allegations establish that their purported injuries -- increased costs associated with the treatment of patients with opioid-

---

²In this case, the plaintiffs have not argued that their unjust-enrichment claims are subject to a six-year statute of limitations.

related conditions -- necessarily occurred <u>years</u> before the applicable accrual date of March 26, 2019." Petition at 1.

In the "Tolling and Fraudulent Concealment" section of the amended complaint, the plaintiffs alleged:

> "1060. Plaintiffs maintain that each Defendant has engaged in conduct within the applicable limitations period and that has been described above. Such misconduct indicates that the statute of limitations does not operate as a bar to Plaintiffs' claims. Nevertheless, Plaintiffs also allege facts, as described below, that toll the running of the statute of limitations.
>
> "....
>
> "1067. As described in this complaint, although Defendants' misconduct that caused the opioid epidemic began many years ago, Defendants have continued to engage in such conduct within the relevant statute of limitations period."

In their amended complaint, the plaintiffs alleged that the remaining defendants have "engaged in conduct within the applicable limitation period" and that "[s]uch misconduct indicates that the statute of limitations does not operate as a bar to Plaintiffs' claims." They further alleged that the applicable statutes of limitations were tolled because the remaining defendants had fraudulently concealed the various causes of action.

29

The petitioners argue that this Court's decision in <u>Abbott</u> "confirms that the continuing tort doctrine does not apply." Petition at 17. They go on to argue:

"Plaintiffs' Amended Complaint preemptively attempts to circumvent the statute of limitations by invoking the continuing tort doctrine, alleging in a conclusory fashion that Distributors' misconduct continues through today. <u>See</u>, <u>e.g.</u>, Am. Compl. ¶¶ 113, 120, 125, 152, 156, 161, 990.[17] But Plaintiffs do not identify <u>any</u> specific conduct within the limitations period. On the contrary, they say that it 'can be inferred' based solely on alleged misconduct in earlier periods. <u>Id.</u> ¶¶ 113, 120, 125, 156, 161. These allegations are not sufficient to trigger the continuing tort doctrine under Alabama law.

"This Court rejected that precise outcome and confirmed the limits of the continuing tort doctrine in <u>Abbott</u>. This Court held that generic allegations that defendants 'continue[] to conduct' wrongdoing or that a particular defendant's tort 'was a continuing pattern of conduct that continued at least until the time that [plaintiffs] filed the lawsuit' are insufficient as a matter of law to avoid the statute of limitations. <u>Abbott</u>, 342 So. 3d at 195 (quoting the complaint). Instead, to invoke the continuing tort doctrine, the complaint must raise '<u>specific allegations</u> against' the defendant of conduct within the limitations period. <u>Id.</u> (emphasis added).

"_____

"[17]As to each Distributor, Plaintiffs rotely allege 'on information and belief that [distributor] continues to operate in ways that enable the diversion of prescription opioids.' <u>Id.</u> ¶¶ 113, 120, 125, 152, 156, 161."

30

Petition at 17-18. However, the petitioners overstate this Court's holding in Abbott regarding the pleading requirements for a continuing tort.

In Abbott, the Mobile County Board of Health and the Family Oriented Primary Health Care Clinic (collectively referred to as "Mobile Health") sued over 60 defendants, including Abbott Laboratories and Abbott Laboratories, Inc. (collectively referred to as "Abbott"). In its complaint, "Mobile Health alleged that Abbott had participated in the marketing of a specific prescription drug, Oxycontin." 342 So. 3d at 188. Mobile Health alleged that the defendants "had caused a public nuisance in the form of an opioid epidemic." Additionally,

> "[w]ith respect to Abbott's conduct, Mobile Health alleged:
>
> "'143. Abbott was primarily engaged in the promotion and distribution of opioids nationally due to a co-promotional agreement with Purdue. Pursuant to that agreement, between 1996 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products as set forth above.
>
> "'144. Abbott, as part of the co-promotional agreement, helped turn OxyContin into the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received twenty-five to thirty percent (25-30%) of all net sales for prescriptions

31

written by doctors its sales force called on. This agreement was in operation from 1996-2002, following which Abbott continued to receive a residual payment of six percent (6%) of net sales up through at least 2006.

"'145. With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.'

"(Emphasis added.)

"Mobile Health asserted that it brought this action because of the burdens it has had to bear as a result of the 'opioid epidemic.'

"'36. Boards of health and their affiliated primary care providers -- legally and morally -- are compelled to act and treat patients with opioid-related conditions[] and, as a result, are directly and monetarily damaged by the opioid epidemic. In addition to the cost of the opioid drugs themselves, boards of health and their affiliated primary care providers have incurred and continue to incur millions of dollars in damages for the costs of uncompensated care as a result of the unlawful marketing, distribution, and sale of opioids. Boards of health and their affiliated primary care providers directly and monetarily bear the brunt of the opioid crisis.

"'37. [Mobile Health is] struggling from the relentless and crushing financial burdens caused by the epidemic of opioid addiction.

"'38. The effects of the opioid epidemic on boards of health and their affiliated primary care providers may soon become even greater. The coverage rules under the Affordable Care Act ("ACA") are in transition, thus creating the possibility of increased costs for boards of health for treatment of opioid-addicted patients admitted under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 395dd. Those increased costs would increase the likelihood that patients would seek treatment through boards of health and their primary care providers.

"'39. [Mobile Health] encounter[s] patients with opioid addiction on a daily basis. [It] must deal with patients who have serious medical conditions that require extra care and expense because the patients are addicted to opioids.

"'40. The statistics are startling. Adult hospitalizations due substantially to opioid-related medical conditions doubled from 2000 to 2012. From 2005 to 2014, emergency department visits exhibited a 99.4% cumulative increase. [Mobile Health has] experienced similar increases in the number of patients seen with opioid-related medical issues.

"'41. Between 2005 and 2014, there was a dramatic increase nationally in hospitalizations involving opioids: the rate of opioid-related inpatient stays increased 64%, and the rate of opioid-related emergency department ("ED") visits nearly doubled. And, likewise, [Mobile Health has] experienced a similar increase in visits from patients with opioid-related medical issues.

"'....

33

"'43. The cost to treat those with opioid addiction has more than tripled in a decade, up to nearly $15 billion in 2012. Similarly, the number of patients hospitalized due to the effects of these drugs surged by more than 72% in 2012, although overall hospitalizations during that time stayed relatively flat. [Mobile Health has] experienced similar increases and similar associated increased costs.

"'44. Private insurance covers only a portion of those costs. The burden is carried by hospitals, boards of health, primary care providers, patients, and government programs. In 2012, hospitals provided almost $15 billion for opioid-related inpatient care, more than double of what they billed in 2002. A substantial portion of these costs were under-insured or unreimbursed.

"'45. In 2012, an average hospital stay for a patient with an opioid-related condition cost about $28,000 and only about 20% of the hospital stays related to those incidents were covered by private insurance. The number increased to $107,000 if there was an associated infection, with merely 14% covered by insurance.

"'46. Patients with complex opioid addiction-related histories (medically and psychosocially) often cannot get treatment at skilled nursing facilities if they are discharged by hospitals.

"'47. The cost of treating opioid overdose victims in hospital intensive care units jumped 58% in a seven-year span. Between 2009 and 2015, the average cost of care per opioid overdose admission increased from $58,000 to $92,400. This was during a period where the overall medical cost

34

escalation was about 19%. This cost increase also highlights a troubling trend: overdose patients are arriving in worse shape, requiring longer stays and a higher level of treatment.

"'....

"'49. The rates of opioid abuse during pregnancy have increased nationally and in Alabama. There has been an almost four-fold increase in admissions to NICUs [neonatal intensive-care units] for NAS over the past decade: from seven cases per 1,000 NICU admissions in 2004, to 27 cases per 1,000 NICU admissions in 2012.

"'....'

"(Emphasis added.)

"On October 15, 2019, Mobile Health filed its original complaint in the Mobile Circuit Court against Abbott and numerous other defendants -- over 60 defendants in all -- alleging that they had caused a public nuisance in the form of an opioid epidemic:

"'1. The opioid epidemic is an ongoing crisis in Alabama. Opioid use has had tragic consequences for communities across Alabama, including those in Mobile, Baldwin, and Conecuh Counties. Thousands of people have died from opioid overdoses, and many thousands more suffer from Opioid use disorders and related health conditions in Alabama. The misrepresentations by Defendants described herein regarding the risks and benefits of opioids enabled, and are continuing to enable, the widespread prescribing of opioids for common chronic pain conditions like lower back pain, arthritis, and headaches.

35

"'....

"'953. This [nuisance] claim is brought under the Alabama common law of nuisance. This claim is also brought pursuant to Ala. Code § 22-3-2(3), which instructs Plaintiff Mobile County Board of Health to abate nuisances.

"'....

"'958. The nuisance created by Defendants is the over-saturation of opioids in the patient population of the geographic area served by [Mobile Health] for illegitimate purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.'

"Mobile Health asserted against Abbott claims of negligence, wantonness, nuisance, unjust enrichment, fraud and deceit, and civil conspiracy. With respect to all of their claims against all the defendants, Mobile Health alleged:

"'918. [Mobile Health is] entitled to a tolling of any statutes of limitation because Defendants fraudulently concealed the existence of their causes of action from [it]. [Mobile Health] did not know, and did not have any reason to know, any of the facts regarding Defendants' marketing misconduct until the DEA's [Drug Enforcement Administration] ARCOS [Automated Reports and Consolidated Ordering System] data was released in 2019. Until then, [Mobile Health was] not aware that the opioid crisis was the result of massive and improper distribution of opioids in the counties that [it] serve[s]. Also, [Mobile Health] did not know, and did not have any reason

36

> to know, of the Defendants' failures to report suspicious orders and otherwise prevent diversion of opioids in the three counties that [it] serve[s] until [it was] able to obtain in 2019 excerpts of pleadings, documents, and testimony produced in the MDL [multidistrict litigation]. [Mobile Health] first became aware of allegations about Defendants' marketing practices from news articles in 2018. Without the ARCOS data, and without the information from the MDL, [Mobile Health was] unable to determine that [it] had a cause of action to pursue against Defendants.'"

Abbott, 342 So. 3d at 189-93 (footnotes omitted).

Abbott filed a motion to dismiss all the claims Mobile Health had stated against it, asserting, among other things, that the claims were barred by the applicable statutes of limitations and the 20-year common-law rule of repose. After Mobile Health filed a response and Abbott filed a reply in support of its motion to dismiss, the trial court entered an order in which it denied Abbott's motion to dismiss. Abbott subsequently filed a mandamus petition in this court. In its mandamus petition, Abbott argued, in part, that Mobile Health's claims against it were barred by the applicable statutes of limitations.

In addressing Abbott's arguments, this Court stated, in pertinent part:

37

" 'The statute of limitations begins to run when the cause of action accrues, which this Court has held is the date the first legal injury occurs.' <u>Ex parte Integra LifeSciences Corp.</u>, 271 So. 3d 814, 818 (Ala. 2018). 'A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury.' <u>Chandiwala v. Pate Constr. Co.</u>, 889 So. 2d 540, 543 (Ala. 2004).

"The claim both parties focus on with respect to the statute of limitations is Mobile Health's nuisance claim. The statute of limitations for a nuisance claim is two years. See, e.g., <u>Ex parte Brian Nelson Excavating, LLC</u>, 25 So. 3d 1143, 1145 (Ala. 2009) (discussing 'the two-year statute of limitations in § 6-2-38, Ala. Code 1975, for nuisance claims'). As Abbott observes, according to the complaint, Abbott last actively marketed OxyContin in 2002 and it received its last payments from its co-promotion agreement with Purdue in 2006, but Mobile Health commenced this action on October 15, 2019. Abbott therefore argues that from the face of the complaint Mobile Health commenced its action 11 years after the expiration of the applicable statute of limitations.

"Mobile Health presents three arguments in response. First, it contends that it alleged that the public nuisance is a continuing tort and, thus, is not barred by the statute of limitations.

" 'The Complaint shows that [Mobile Health] alleges that Abbott's tort was a continuing pattern of conduct that continued at least until the time that [Mobile Health] filed the lawsuit. See generally Complaint. Thus, under established Alabama law, the Complaint sufficiently alleges continuing tortious conduct and the statute of limitations does not bar this continuing nuisance claim.'

38

"Mobile Health's brief, p. 15. For support, Mobile Health cites such cases as <u>Alabama Great Southern R.R. v. Denton</u>, 239 Ala. 301, 305, 195 So. 218, 221 (1940), in which this Court stated: 'We recognize that one maintaining a continuing public nuisance, as for example, one endangering the public health or public safety, cannot defend against a suit to abate same because of the lapse of time.' See also <u>Holz v. Lyles</u>, 287 Ala. 280, 284, 251 So. 2d 583, 587 (1971) ('But one maintaining a continuing public nuisance cannot defend against a suit to abate the nuisance because of lapse of time ....').

"Mobile Health is certainly correct that it generally alleged a continuous tort against the marketing defendants[, which included Abbott].

> "'221. Each Marketing Defendant has conducted, and continues to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Marketing Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny, trivialize, or materially understate the risks of opioids while overstating the benefits of using them for chronic pain.'

"However, the <u>specific allegations against Abbott</u> in the complaint do not mention conduct of any kind by Abbott after 2006. This is important because there must be a connection between the defendant's actions and the ongoing tort.

> "'This Court has used the term "continuous tort" to describe <u>a defendant's repeated tortious conduct</u>

39

which has repeatedly and continuously injured a plaintiff. These cases can be analyzed by analogizing the plaintiffs' cause of action to the common law action of continuing trespass or trespass on the case.

"'This Court has held that a defendant's repeated wrongs to the plaintiff can constitute a "continuous tort," such as: (1) when an employer exposes its employee on a continuing basis to harmful substances and conditions [American Mut. Liability Ins. Co. v. Agricola Furnace Co., 236 Ala. 535, 183 So. 677 (1938)]; (2) when there is a "single sustained method pursued in executing one general scheme," as in a blasting case [Lehigh Portland Cement Co. v. Donaldson, 231 Ala. 242, 246, 164 So. 97 (1935)]; and (3) when a plaintiff landowner seeks damages for the contamination of a well or stream [Howell v. City of Dothan, 234 Ala. 158, 174 So. 624 (1937); Employers Insurance Company of Alabama v. Rives, 264 Ala. 310, 87 So. 2d 653 (1955); and Alabama Fuel & Iron Co. v. Vaughn, 203 Ala. 461, 83 So. 323 (1919)].

"'The stream and well pollution cases, the blasting cases, and the employer-employee cases are all cases in which this Court has held that the defendants committed a continuous tort. The cases are analogous to a continuing trespass in that the repeated actions of the defendants combined to create a single cause of action in tort.'

"Moon v. Harco Drugs, Inc., 435 So. 2d 218, 220-21 (Ala. 1983) (emphasis added). See also Continental Cas. Ins. Co. v. McDonald, 567 So. 2d 1208, 1216 (Ala. 1990) (holding that 'an action such as this, arising from continuing dealings between the parties, will not be barred until two years after the last tortious act by the defendant' (emphasis added)). Holz and

40

Denton contain this same idea by discussing a defendant's 'maintaining a continuing public nuisance,' indicating that the reason the statute of limitations does not expire for a continuous tort is because the defendant's conduct is ongoing within the period of the statute of limitations. Cf. Payton v. Monsanto Co., 801 So. 2d 829, 836 (Ala. 2001) (concluding that the plaintiff's 'complaint describing continuing discharge of PCBs as of the time of the commencement of this action' allowed the claims to 'survive a defense of limitations by proof of conduct occurring within the limitations period'); Alabama Power Co. v. Gielle, 373 So. 2d 851, 854 (Ala. Civ. App. 1979) ('A continuing trespass creates successive causes of action, and damages may be recovered for the trespass occurring within the statutory period.').

"In short, the fact that the alleged opioid epidemic itself was ongoing at the time Mobile Health filed its original complaint does not mean that Abbott's conduct in relation to the epidemic is not subject to the statute of limitations. As the Court explained in Payton:

"'Alabama law does not recognize a continuing tort in instances where there has been a single act followed by multiple consequences.[2]

"'_____

"'[2]Moon v. Harco Drugs, Inc., 435 So. 2d 218, 220-21 (Ala. 1983), discusses the concept of "continuous tort," describing it as a defendant's liability for repeated wrongs to the plaintiff. Then, the Court offers several illustrations, including "when a plaintiff landowner seeks damages for the contamination of a well or stream." Id. at 221. However, the three cases cited to support this proposition involve repetitive acts or ongoing wrongdoing[:] Howell v. City of Dothan, 234 Ala. 158, 174 So. 624 (1937) (ongoing discharge of

41

> sewage), <u>Employers Insurance Co. of Alabama v. Rives</u>, 264 Ala. 310, 87 So. 2d 653 (1955) (opinion refers to repetitive acts), <u>Alabama Fuel & Iron Co. v. Vaughn</u>, 203 Ala. 461, 83 So. 323 (1919) (damage resulting from the ongoing operations of a coal mine).'

> "801 So. 2d at 835 (emphasis added). There are no allegations of ongoing wrongdoing <u>by Abbott</u> within two years of the date Mobile Health filed its original complaint. Therefore, Mobile Health's general allegation of a continuous public nuisance does not save its claims against Abbott from the statute-of-limitations bar."

<u>Abbott</u>, 342 So. 3d at 194-96 (footnote omitted).

The petitioners argue that, in <u>Abbott</u>, this Court held that, "to invoke the continuing tort doctrine, the complaint must raise '<u>specific allegations</u> against' the defendant of conduct within the limitations period. [<u>Abbott</u>, 342 So. 3d at 195] (emphasis added)." Petition at 18. However, the petitioners overstate this Court's holding in <u>Abbott</u>.

Contrary to the petitioners' argument, <u>Abbott</u> did not hold that a complaint must allege specific factual allegations against a defendant "to invoke the continuing tort doctrine." Petition at 18. In <u>Abbott</u>, Mobile Health's complaint alleged that "Abbott last actively marketed OxyContin in 2002 and it received its last payments from its co-promotion agreement with Purdue in 2006, but Mobile Health

42

commenced this action on October 15, 2019." 342 So. 3d at 195. This Court acknowledged that Mobile Health had "generally alleged a continuous tort against the marketing defendants." Id. Additionally, we did not hold that such general allegations against the marketing defendants were insufficient to allege a continuing tort for statute-of-limitations purposes. Rather, this Court looked at Mobile Health's specific factual allegations against Abbott. The complaint in that case included specific factual allegations that "Abbott last actively marketed OxyContin in 2002 and it received its last payments from its co-promotion agreement with Purdue in 2006." Id. This Court emphasized that "the specific factual allegations against Abbott did not mention conduct of any kind by Abbott after 2006" and that "[t]his is important because there must be a connection between the defendant's actions and the ongoing tort." Id. (second emphasis added). This Court went on to state that "[t]here are no allegations of ongoing wrongdoing by Abbott within two years of the date Mobile Health filed its original complaint. Therefore, Mobile Health's general allegation of a continuous public nuisance does not save its claim against Abbott from the statute-of-limitations bar." Id. at 196. Based on the foregoing, it is clear that in

Abbott this Court did not hold that a complaint alleging a continuous tort must include specific factual allegations regarding a defendant's conduct that purportedly occurs during the limitations period. Rather, our decision was based on the fact that the compliant in that case included specific factual allegations showing that Abbott's alleged misconduct had ended more than two years before the filing of the complaint in that case.

In this case, the amended complaint, which was filed after this Court decided Abbott, included specific factual allegations regarding conduct by each of the petitioners that took place outside the two-year statute of limitations and conduct that took place outside Alabama. However, based on those allegations, the plaintiffs asserted that the petitioners have engaged in a pattern of misconduct. They further asserted, "on information and belief," that each of the petitioners "continues to operate in ways that enable the diversion of prescriptive opioids." Additionally, with regard to the "impact of defendants' activities on plaintiffs," the plaintiffs alleged:

> "266. Plaintiffs have treated, and continue to treat, numerous patients for opioid-related conditions, including: (1) opioid overdose; (2) opioid addiction; (3) hepatitis C, HIV, and other infections occurring as a result of intravenous drug use; (4) neonatal treatment in its NICU for babies born opioid-dependent, for which treatment is specialized, intensive,

44

complex, lengthy and highly expensive; and (5) psychiatric and related treatment for patients with opioid addiction who present in need of mental health treatment programs.

"267. Plaintiffs' hospitals have suffered <u>a continuing operational impact</u> as a consequence of the opioid epidemic created by Defendants' conduct. Simply put, providing the same level of care and service to patients is more expensive in the presence of an opioid epidemic than it would be without that epidemic. For instance, the same medical or surgical procedure is often more expensive to perform on a patient with an opioid use disorder than on a patient without that disorder due to the need to take additional measures and steps to ensure the patient's safety during and after the procedure.

"268. Additionally, individuals with opioid addiction have presented <u>and continue to present themselves to Plaintiffs claiming to have illnesses and medical problems in an effort to obtain opioids</u>. Plaintiffs have incurred <u>and continue to incur</u> operational costs related to the time and expenses in diagnosing, testing, and otherwise attempting to treat these individuals.

"....

"271. Patients with opioid-related conditions seek treatment from Plaintiffs as a proximate result of the opioid epidemic created and engineered by Defendants. As a result, Plaintiffs' monetary losses with respect to treatment of these patients were and are foreseeable to Defendants and were and are the proximate result of Defendants' acts and omissions specified herein. Second, patients with opioid conditions have caused Plaintiffs to incur, <u>and continue to incur</u>, increased costs in the form of surgical procedures and other care that have been and are more complex and expensive than they would otherwise be if the patients were not using or abusing opioids."

45

(Emphasis added.)

Based on those factual allegations, the amended complaint generally alleged a continuing tort against the petitioners. However, unlike the situation in <u>Abbott</u>, the amended complaint did not include any specific allegations stating or suggesting that any of the petitioners' alleged misconduct had ended before March 26, 2019, or at any time before the filing of the complaint. Rather, the complaint specifically alleged that each of the petitioners "continues to operate in ways that enable the diversion of prescriptive opioids." Thus, the facts in this case are clearly distinguishable from the facts in <u>Abbott</u>.

As we have stated:

"We note that pleadings are to be liberally construed in order to effect the purpose of the Alabama Rules of Civil Procedure and that every reasonable intendment and presumption must be made in favor of the pleader. See Rule 8, Ala. R. Civ. P.; <u>Ex parte International Refining & Mfg. Co.</u>, 972 So. 2d 784, 789 (Ala. 2007)."

<u>Ex parte Moulton</u>, 116 So. 3d 1119, 1132 (Ala. 2013). As this Court noted in <u>Abbott</u>,

"[w]ith respect to evaluating a trial court's denial of a Rule 12(b)(6) motion to dismiss,

46

"'[t]he appropriate standard of review ... is whether "when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [the pleader] to relief." <u>Nance v. Matthews</u>, 622 So. 2d 297, 299 (Ala. 1993); <u>Raley v. Citibanc of Alabama/Andalusia</u>, 474 So. 2d 640, 641 (Ala. 1985). This Court does not consider whether the plaintiff will ultimately prevail, but only whether the plaintiff may possibly prevail. <u>Nance</u>, 622 So. 2d at 299. A "dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." <u>Nance</u>, 622 So. 2d at 299; <u>Garrett v. Hadden</u>, 495 So. 2d 616, 617 (Ala. 1986); <u>Hill v. Kraft, Inc.</u>, 496 So. 2d 768, 769 (Ala. 1986).'

"<u>Lyons v. River Rd. Constr., Inc.</u>, 858 So. 2d 257, 260 (Ala. 2003)."

342 So. 3d at 194.

"We emphasize that, at this stage of the proceedings, the applicable standard of review required the circuit court and requires this Court to view [the plaintiffs'] allegations most strongly in [their] favor and to consider only whether [they] might possibly prevail if [they] can prove [their] allegations. See <u>Ex parte Abbott Lab'ys</u>, 342 So. 3d at 194. The issue before us is not one of proof; rather, the issue is whether the action can be maintained if [the plaintiffs'] allegations are true. See <u>id.</u>"

<u>Ex parte Mobile Infirmary Ass'n</u>, 349 So. 3d 842, 847 (Ala. 2021).

47

Viewing the plaintiffs' allegations that the petitioners' alleged misconduct continued through the time of the filing of the complaint as true, the plaintiffs' claims would not be barred by the applicable statutes of limitations. Thus, it is not clear <u>from the face of the complaint</u> that the plaintiffs' claims against the petitioners are barred by the applicable statutes of limitations. Whether the plaintiffs will be able to present proof that the petitioners actually engaged in misconduct within the limitations period is not before us at this time. Therefore, the trial court did not err when it denied the petitioners' motion to dismiss on statute-of-limitations grounds. Accordingly, the petitioners are not entitled to an order dismissing the plaintiffs' claims against them.[3]

<u>Conclusion</u>

Based on the foregoing, the petitioners have not established that the face of the amended complaint clearly demonstrated that the plaintiffs' claims against them are barred by the applicable statutes of limitations and that the trial court erred when it denied their motion to dismiss. Accordingly, the petitioners have not established a clear legal

---

[3]Based on this holding, we pretermit discussion of the petitioners' argument that the doctrine of fraudulent concealment does not apply.

right to the relief they seek. Therefore, the petition for a writ of mandamus is denied.

PETITION DENIED.

Parker, C.J., and Shaw, Wise, Bryan, Mendheim, Stewart, and Mitchell, JJ., concur.

Cook, J., concurs in the result, with opinion.

Sellers, J., dissents.

COOK, Justice (concurring in the result).

I concur in the result but do so with hesitation. The question presented is whether the claims alleged in the most recent amended complaint were sufficiently pleaded to withstand the petitioners' motion to dismiss. What makes this question particularly difficult in the present case is that the petitioners moved to dismiss the plaintiffs' claims against them based upon an affirmative defense -- that the claims are barred by the applicable statutes of limitations.

On the one hand, the most recent amended complaint is voluminous and contains <u>conclusory, general allegations</u> of wrongdoing by each of the petitioners that are <u>within</u> the applicable two-year statute-of-limitations period. For instance, as to each of the petitioners, the amended complaint stated:

> "From this pattern of instances, it can be inferred that [the petitioners'] policies and procedures have failed to adapt and change in order to prevent the future diversion of prescription opioids. On that basis, Plaintiffs <u>allege on information and belief that [the petitioners] continue[] to operate in ways that enable the diversion of prescription opioids</u>."

(Emphasis added.) On the other hand, the complaint also cited <u>specific dates</u> for alleged wrongdoing by the petitioners that are <u>outside</u> of the applicable limitations period. What are we to make of this?

50

The main opinion concludes that, at the pleading stage, these allegations are sufficient to satisfy the pleading requirements for a continuous-tort claim. I am not so sure.

The petitioners rely almost exclusively upon this Court's recent decision in Ex parte Abbott Laboratories, 342 So. 3d 186 (Ala. 2021), in arguing that we must grant their petition for a writ of mandamus and order the trial court to grant their motion to dismiss. Specifically, they assert that "[t]his Court should grant mandamus review and confirm that Abbott compels dismissal because [the plaintiffs'] own allegations establish that their purported injuries … necessarily occurred years before the applicable accrual date" in the present action. Petition at 1.

In Abbott, we explained:

> " 'The statute of limitations begins to run when the cause of action accrues, which this Court has held is the date the first legal injury occurs.' Ex parte Integra LifeSciences Corp., 271 So. 3d 814, 818 (Ala. 2018). 'A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury.' Chandiwala v. Pate Constr. Co., 889 So. 2d 540, 543 (Ala. 2004).
>
> "….
>
> "Mobile Health is certainly correct that it generally alleged a continuous tort against the marketing defendants[, including Abbott].

51

"'....'

"However, the specific allegations against Abbott in the complaint do not mention conduct of any kind by Abbott after 2006. This is important because there must be a connection between the defendant's actions and the ongoing tort.

"'....'

"... There are no allegations of ongoing wrongdoing by Abbott within two years of the date Mobile Health filed its original complaint. Therefore, Mobile Health's general allegation of a continuous public nuisance does not save its claims against Abbott from the statute-of-limitations bar."

342 So. 3d at 194-96 (some emphasis added).[4]

_____

[4]We also explained that continued consequences of the original tortious conduct do not constitute a continuing tort; rather, we explained, there must be continued tortious conduct:

"[T]he fact that the alleged opioid epidemic itself was ongoing at the time Mobile Health filed its original complaint does not mean that Abbott's conduct in relation to the epidemic is not subject to the statute of limitations. As the Court explained in Payton[ v. Monsanto Co., 801 So. 2d 829 (Ala. 2001)]:

"'Alabama law does not recognize a continuing tort in instances where there has been a single act followed by multiple consequences.'[2]

"'_____

"'[2]Moon v. Harco Drugs, Inc., 435 So. 2d 218, 220-21 (Ala. 1983), discusses the concept of "continuous tort," describing it as a defendant's

The petitioners certainly have a point that this case is very similar to <u>Abbott</u>. I find it very difficult to distinguish that case from the procedural posture in this case. Both this case and <u>Abbott</u> present (1) nuisance claims regarding improper prescription-drug distribution; (2) allegations based on specific facts that occurred more than two years before the lawsuit was commenced; and (3) general allegations that the wrongful conduct continued.

The main opinion contends, among other things, that <u>Abbott</u> can be distinguished because the complaint in that case specifically alleged that

> <u>liability for repeated wrongs to the plaintiff</u>. Then, the Court offers several illustrations, including "when a plaintiff landowner seeks damages for the contamination of a well or stream." <u>Id.</u> at 221. However, the three cases cited to support this proposition involve <u>repetitive acts or ongoing wrongdoing</u>[:] <u>Howell v. City of Dothan</u>, 234 Ala. 158, 174 So. 624 (1937) (ongoing discharge of sewage), <u>Employers Insurance Co. of Alabama v. Rives</u>, 264 Ala. 310, 87 So. 2d 653 (1955) (opinion refers to repetitive acts), <u>Alabama Fuel & Iron Co. v. Vaughn</u>, 203 Ala. 461, 83 So. 323 (1919) (damage resulting from the ongoing operations of a coal mine).'

"801 So. 2d at 835 (emphasis added)."

<u>Id.</u> at 196.

53

the wrongful "co-promotion agreement" to market the opioid OxyContin between Abbott and Purdue had expired. True. But <u>Abbott</u> also included general allegations of continued wrongful conduct after that agreement had expired, just like here. For instance, the complaint in <u>Abbott</u> alleged:

> "'221. <u>Each Marketing Defendant</u> has conducted, <u>and continues to conduct</u>, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Marketing Defendant spent, and <u>continues to spend</u>, millions of dollars on promotional activities and materials that falsely deny, trivialize, or materially understate the risks of opioids while overstating the benefits of using them for chronic pain.'"

<u>Id.</u> at 195 (emphasis added). And yet, this Court in <u>Abbott</u> held that the claims against Abbott were due to be dismissed.

Thus, how do we distinguish <u>Abbott</u>? Is it enough that the plaintiffs' most recent amended complaint uses the words "upon information and belief"? Is it enough that the complaint in this case uses a separate paragraph for each defendant (by name) to make generalized allegations of continued conduct? Perhaps the best argument is that there was no <u>reason to think</u> in <u>Abbott</u> that the wrongful conduct persisted (even though the complaint claimed that it did) because one particular factual

54

allegation of wrongdoing (the co-marketing agreement) had ended. Whereas in the present case, perhaps there is <u>reason to think</u> that the wrongs might have continued because the wrongs alleged with actual facts did not include an end date.[5] I do not find any of these arguments to be particularly persuasive in distinguishing <u>Abbott</u> from the present case.

If I were to only focus on distinguishing <u>Abbott</u>, I would dissent. However, I note that this Court has a long line of caselaw holding that our pleading standard is liberal. For instance, this Court has previously stated:

---

[5]It might be possible to argue that the language of <u>Abbott</u> requires that allegations of continuing conduct be specific. For instance, in rejecting the argument about general allegations of continued wrongful conduct, this Court noted that "Mobile Health is certainly correct that it <u>generally alleged a continuous tort</u> against the marketing defendants" but that "the <u>specific allegations against Abbott in the complaint do not mention</u> conduct of any kind by Abbott after 2006." <u>Id.</u> at 195 (some emphasis added).

However, the only textual basis in the Alabama Rules of Civil Procedure for a requirement of "specific allegations" is in relation to allegations of fraud or mistake, per Rule 9(b), Ala. R. Civ. P. ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The petitioners have not argued that Rule 9, Ala. R. Civ. P., applies to the continuing-tort allegations here.

"'[T]he dismissal of a complaint is not proper if the pleading contains "even a generalized statement of facts which will support a claim for relief under [Ala. R. Civ. P.] 8" (Dunson v. Friedlander Realty, 369 So. 2d 792, 796 (Ala. 1979)), because "[t]he purpose of the Alabama Rules of Civil Procedure is to effect justice upon the merits of the claim and to renounce the technicality of procedure." Crawford v. Crawford, 349 So. 2d 65, 66 (Ala. Civ. App. 1977).'"

Segrest v. Segrest, 328 So. 3d 256, 274 (Ala. 2020) (quoting Simpson v. Jones, 460 So. 2d 1282, 1285 (Ala. 1984)).

Notably, this pleading standard is more liberal than the standard currently applied in federal courts. See generally Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (requiring that the complaint state a "plausible claim"). If we were to apply the federal pleading standard in this case, we would be called upon to determine whether the allegation that "on information and belief" the petitioners "continue[] to operate in ways that enable the diversion of prescription opioids" is plausible in light of, among other things, the actual facts pleaded in the most recent amended complaint. However, in this case, we have been asked neither to adopt the federal pleading standard nor to overrule our caselaw upholding Alabama's

56

liberal pleading standard.[6]

Moreover, the petitioners' motion was not an ordinary motion to dismiss. It was a motion to dismiss based upon an affirmative defense. As noted in the main opinion, "'the standard for granting a motion to dismiss based upon the expiration of the statute of limitations is whether the existence of the affirmative defense <u>appears clearly on the face of the pleading</u>.'" <u>Jones v. Alfa Mut. Ins. Co.</u>, 875 So. 2d 1189, 1193 (Ala. 2003) (quoting <u>Braggs v. Jim Skinner Ford, Inc.</u>, 396 So. 2d 1055, 1058 (Ala. 1981)) (some emphasis added). I agree with the main opinion that it is not clear from the face of the most recent amended complaint that the plaintiffs' claims against the petitioners are barred by the applicable statutes of limitations.

Because this case is before us on a petition for a writ of mandamus

---

[6]I note that federal courts and many state courts across the country have operated under the heightened pleading standard enunciated in <u>Twombly</u> and <u>Iqbal</u>, <u>supra</u>, for many years. While I offer no opinion on whether this more stringent pleading standard should be adopted in Alabama, I make this observation in the hope that future litigants may consider raising this issue in an appropriate case for our Court to fully consider after input from members of the public wishing to file amicus briefs (including whether the heightened standard might be appropriate in all cases or only in a subset of cases).

-- an "extraordinary remedy" which is applicable only when there is "'a clear legal right,'" Ex parte Watters, 212 So. 3d 174, 180 (Ala. 2016) (citation omitted) -- we need not decide at this time whether the plaintiffs will be able to present proof that the petitioners actually engaged in the alleged misconduct during the applicable limitations period. This Court can confront that question, if necessary, on appeal, upon the facts that are in the record, rather than upon the limited basis of the pleadings.[7] It is for this reason that I concur in the result.

---

[7]I note the argument of the plaintiffs that the petitioners' alleged activity also constituted an "abatable nuisance." The petitioners reply by arguing, among other things, that "abatable nuisance" was not pleaded and that no abatable nuisance existed because it would require additional tortious conduct within the limitations period, rather than additional consequences from the earlier tortious conduct. They state that each case cited by the plaintiffs involved "wrongdoing that occurred within (and led to harm during) the limitations period." Petitioner's reply brief at 6. Given the majority's resolution of this mandamus petition, we need not reach the question whether the plaintiffs alleged an abatable nuisance or whether, under Alabama law, an abatable nuisance requires wrongful conduct within the limitations period -- i.e., whether in this case the alleged nuisance is abated when the wrongful distribution of opioids ceases or whether the alleged nuisance is abated only when the resulting consequences of the distribution are remedied.